IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) No. 11-cr-20301-JTF/TMP |
| NOEL PAUL HAMMER, JR., | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

_____

# REPORT AND RECOMMENDATION

_____

Before the court by order of reference is defendant Noel Paul Hammer, Jr.'s Motion to Suppress Evidence, filed on February 28, 2012. (ECF No. 28.) In his motion, Hammer argues that his Fourth Amendment rights were violated when police officers allegedly conducted a search of his residence and seized large quantities of marijuana and cash, without first obtaining a search warrant. He also argues that officers violated his constitutional rights when they obtained statements from him while in custody. The government filed a response in opposition on March 9, 2012. On March 19, 2012, Hammer filed an Amended and Supplemented Motion to Suppress.[1] A hearing on the

_____

[1]On September 5, 2012, Hammer filed a *pro se* motion styled "Combined Defendant's Pro Se Supplemental Motion to Suppress

motion was held on September 26, 2012.² The court heard testimony from Officer Ron Trentham, Detective Chauncey Owens, Detective Patrick Fox, and Sergeant Lorenzo Young, all of whom are members of the Memphis Police Department ("MPD"). The court also received as evidence several exhibits, including photographs of Hammer's house before and after the search; statements and rights waiver forms signed by Hammer; copies of search and arrest warrants and accompanying affidavits; police reports written by officers; and a video recording of the search of Hammer's house.

For the reasons below, the court recommends that Hammer's Motion to Suppress be denied.

## I.   PROPOSED FINDINGS OF FACT

The court has carefully considered the evidence presented at the hearing, including the witnesses' demeanor as they testified. The court finds the government's witnesses to be

---

Evidence Seized in Violation of the Fourth Amendment Under the Fruits of the Poisonous Tree Doctrine and Motion Requesting Replacement Counsel."  (ECF No. 89.)  At the beginning of the suppression hearing, Hammer stated that he was withdrawing his request to replace counsel.  As for the other arguments raised in Hammer's *pro se* motion, those arguments were raised by his counsel at the hearing and are addressed in this report and recommendation.

²The hearing was originally scheduled for March 20, 2012, but was continued multiple times upon motion of the defendant.

credible, and therefore adopts their accounts of the events as its findings of fact.

On December 6, 2011, at approximately 8:57 p.m., MPD Officer Ron Trentham received a call over the radio reporting that a man was pounding on the back door of a residence located at 1420 Leafhaven Cove. The caller reported hearing gunshots at the residence next door and requested police assistance. Officer Trentham responded to the call. Upon entering the residence at 1420 Leafhaven Cove, Officer Trentham found a man, later identified as Arvilla Malone, lying on the stairs inside the house, holding bandages to a gunshot wound. Malone told Officer Trentham that he had been next door at 1424 Leafhaven Cove when four or five men with guns broke into the house. According to Malone, he was shot during a gun fight that ensued. When asked if there were any other people inside the residence, Malone told Officer Trentham that Noel Hammer lived there, and that there was also an eight-year-old girl in the house. Officer Trentham, believing that there might be other victims in Hammer's residence, made a radio request for officers to conduct a sweep of that residence. Two officers responded, an "Officer Sanders" and an "Officer Reap," who looked inside Hammer's house while Officer Trentham waited for an emergency response vehicle to arrive.

Once Malone was taken to the hospital, Officer Trentham joined the other officers at Hammer's residence. Officer Trentham walked through the residence and saw evidence of a home invasion robbery, consistent with the information he had received from Malone. He observed several spent shell casings, a large amount of blood in the laundry room, blood on the couch in the living room, numerous bullet holes in the walls, and several live rounds of ammunition and magazines. Officer Trentham also observed marijuana and cocaine residue, including small amounts of marijuana around the coffee table in the living room where it appeared that marijuana cigarettes had been rolled. He walked through the entire house, but did not open any closets, cabinets, or drawers. Officer Trentham then called for assistance from his supervisor, who in turn requested assistance from officers with Felony Response.[3] While waiting for Felony Response to arrive, Officers Trentham, Sanders, and Reap waited inside the residence to preserve the crime scene.

At approximately 9:30 p.m., officers with Felony Response arrived at the residence to conduct a home invasion robbery

---

[3] Officer Trentham testified that the amount of blood observed in the home did not appear to be consistent with only a single gunshot wound. Upon contacting area hospitals to find out if any gunshot victims had been admitted recently, Officer Trentham discovered that an eight-year-old girl had been admitted to the hospital for a gunshot wound to her shoulder. Officer Trentham later confirmed that the girl was Hammer's daughter.

investigation. One of the officers was MPD Sergeant Lorenzo Young. He and other responding officers went into the house and conducted a visual inspection, and then waited outside for Crime Scene investigators to arrive.[4] While Sergeant Young was waiting outside, Officer Trentham and Officer Reap, who were still inside the home, heard a noise that sounded like someone moving around in the back of the residence. They went to the hallway where the noise had come from and saw that a door to a utility closet had come open. On the ground in front of the open door were three wrapped bundles. The officers also saw several other wrapped bundles stacked inside the closet. Officer Trentham detected the smell of raw marijuana. Based on the odor and the manner in which the bundles were wrapped, Officer Trentham believed that they contained marijuana. The officers notified Sergeant Young of their discovery. The MPD's Organized Crime Unit ("OCU"), which investigates narcotics crimes, was then called to the scene.[5]

About ten OCU detectives, including Detective Chauncey Owens, arrived at the residence between midnight and 1:00 a.m.

---

[4] Young testified that during his walk-through, he did not see any large sums of money or bundles of marijuana.

[5] At around 1:00 a.m., Sergeant Young inventoried the robbery related evidence. His inventory list did not include marijuana or money. Sergeant Young testified that he did not include the narcotics in his inventory because he was there to investigate the home invasion, not any drug related offenses.

In addition to seeing the wrapped bundles and smelling the odor of marijuana, Detective Owens observed a brown purse sitting open on a table in the dining room. Detective Owens observed a large sum of money inside the purse, which Detective Owens believed to be drug proceeds. After about twenty or thirty minutes, Detective Owens returned to his office to draft an affidavit for a search warrant. In the affidavit, Detective Owens attested that, upon conducting a protective sweep in relation to an aggravated assault call at the home, officers observed blood, spent shell casings, large sums of money, and what appeared to be several bundles of marijuana in the home. Upon obtaining the search warrant, Detective Owens returned to Hammer's residence, where he and other OCU officers conducted a search of the home. The officers removed approximately seventeen wrapped bundles from the closet and seized approximately $13,000.00 from the purse that Detective Owens saw on the dining room table. Other large amounts of cash were found in other areas of the house, totaling over $95,000.00.[6]

---

[6]During Detective Owen's testimony, Hammer presented a video taken by an OCU officer of the search. In the video, the officer taking the video can be heard stating the time as being 4:22 a.m. The video shows several wrapped bundles stacked on the living room table, and several officers in the process of searching the home. Detective Owens explained that the video was shot after the warrant had been obtained and after the officers had already begun executing the search warrant. In

On the morning of December 7, 2011, Detective Patrick Fox, an MPD Detective assigned to OCU, was contacted by his supervisor, who told Detective Fox that Hammer had been a victim of a home invasion robbery and that there were drugs found at his residence. At around 9:30 a.m., Detective Fox interviewed Hammer at the Robbery Office. Also present at the interview were detectives from the Robbery Division. Although Hammer was under arrest at the time, Detective Fox's stated purpose for conducting the interview was to take a "victim statement" because Hammer had been a victim of a home invasion. Hammer was not read his Miranda rights prior to the initiation of the interview. It is undisputed that Detective Fox knew Hammer was a convicted felon and that the questions he was going to ask Hammer regarding the home invasion could potentially lead to incriminating statements.

During the victim statement interview, Hammer admitted that he defended himself against the robbers in his residence by grabbing a firearm and shooting back at them. At that point, Detective Fox stopped the interview and read Hammer his Miranda rights. Hammer was also provided a written Advice of Rights form, which he signed. At the end of the victim statement

---

other words, the officers did not begin searching the residence until after they obtained the warrant.

interview, Detective Fox typed up Hammer's statement and showed it to him. Hammer was told that he could make corrections to the statement. Detective Fox told Hammer that if the statement was true and correct, he should initial each page and sign the last page. Hammer initialed and signed this statement.[7]

At around 12:15 p.m., Detective Fox began to take a "suspect statement" from Hammer, based on the drugs, cash, and weapons found in his residence. Detective Fox Mirandized Hammer again prior to this second interview. Hammer indicated that he understood his rights and wished to speak to the officers. Detective Fox then questioned him about the large bundles of marijuana recovered from the house, the cash found, and the weapons used during the robbery. At the end of this interview, Detective Fox typed up the statement and gave Hammer the opportunity to review the statement. Hammer reviewed his statement, initialed each page, and signed the last page. Following this interview, Detective Fox and another detective provided Hammer with a form which contained several questions regarding his possession of the firearm. Along with that questionnaire, Detective Fox presented Hammer with a rights waiver form. Hammer initialed and signed the rights waiver,

---

[7]This statement from the first interview with Hammer was referred to by Detective Fox (and labeled on the document) as Hammer's "Victim Statement."

answered the questions, and signed the questionnaire. Throughout the interrogation, Hammer expressed concern about his daughter and his brother, who also had been inside Hammer's residence during the robbery and was injured by the robbers. Detective Fox provided Hammer with updates on their health status. However, Detective Fox made no promises or threats during his questioning of Hammer.[8] At around 4:30 p.m., Hammer signed a consent to search form, authorizing officers to search his house for drug-related evidence.

## II. PROPOSED CONCLUSIONS OF LAW

### A. Search of Hammer's Residence

In his motion, Hammer argues that the officers, prior to obtaining the search warrant, unlawfully opened the utility closet that stored the bundles of marijuana and opened the purse on the dining room table that contained the $13,000.00 in cash. Hammer contends that because the officers exceeded the scope of the protective sweep of his house, it was unlawful for them to

---

[8]Hammer claims in his *pro se* motion that "[d]uring Defendant's interrogation Defendant was told by arresting officers that his daughter had 'taken a turn for the worse' at the hospital, and if Defendant wanted to make a 'death-bed' visit with his brother, he must sign a statement/confession admitting to everything. Defendant signed 'everything' placed in front of him and admitted to everything under extreme duress." At the hearing, the only evidence presented to the court regarding Hammer's interrogation was through Detective Fox, who testified that no such statements, promises, or threats were made to Hammer. The court credits Detective Fox's testimony.

obtain a search warrant based on the fruits of that illegal sweep. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. CONST. amend. IV. Consequently, warrantless searches are presumed unreasonable unless they fall within certain recognized exceptions to the warrant requirement. United States v. Radka, 904 F.2d 357, 360 (6th Cir. 1990).

There are typically four exigent circumstances justifying warrantless entry into a dwelling: (1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) the need to prevent a suspect's escape; (4) and the risk of danger to the police or to other persons inside or outside the dwelling. Minnesota v. Olson, 495 U.S. 91, 100 (1990); see also United States v. Ponder, 240 F. App'x 17, 20 (6th Cir. 2007). The court finds, and Hammer does not dispute, that exigent circumstances justified the officers' entry into Hammer's residence to search for victims and the armed perpetrators. The officers reasonably believed, based on Malone's injuries and the information provided by Malone as well as Hammer's neighbor

during the initial police call, that there may have been suspects or other victims in the house.

The court further finds that the officers did not exceed the scope of their limited search for victims and suspects. In conducting the sweep, the officers only looked in locations inside the house where a person might have been hiding. The bundles of marijuana that were found in the hallway fell out of a utility closet into plain view, likely due to the weight of the narcotics against the door and possible shifting that occurred during the home invasion. See, e.g., United States v. Davis, 341 F. App'x 139, 142 n.3 (6th Cir. 2009) (stating that the discovery of a gun would have been constitutional had it been in plain view during the course of a lawful protective sweep); United States v. Lanier, 285 F. App'x 239, 241 (6th Cir. 2008) ("While conducting a protective sweep, an officer may seize contraband found in plain view if its incriminating character is immediately apparent.") As for the money that Detective Owens saw in the open purse, the court finds credible the detective's testimony that he saw the money when he observed the open purse on the table. Detective Owens's observation of the money in plain view did not impermissibly exceed the scope

of the search.[9]  Thus, the court recommends that Hammer's motion to suppress the evidence seized from his residence pursuant to the search warrant be denied.

**B.  Post-Arrest Statements**

Police officers are required to issue Miranda warnings "*prior to questioning* whenever a suspect is (1) interrogated (2) while in custody." Mason v. Brunsman, No. 09-3939, 2012 WL 1913965, at *3 (6th Cir. May 29, 2012).  Custodial interrogation occurs when a person is taken into custody and law enforcement officers initiate questioning of that person.  Id.  The law

---

[9] Although Officer Trentham and Sergeant Young testified that they did not see any large sums of money when they went through Hammer's house, this testimony does not discredit Detective Owens's testimony that he saw the money inside the open purse, as it is likely that Officer Trentham and Sergeant Young simply did not look inside the open purse.  Moreover, even assuming, *arguendo*, that Detective Owens opened the purse before he obtained the search warrant, the court would nevertheless conclude that the affidavit was supported by probable cause, based solely on the large quantities of marijuana bundles found inside the utility closet.  See, e.g., United States v. Moore, 661 F.3d 309, 312 (6th Cir. 2011); United States v. Wilson, No. 11-1021, 2012 WL 4457583, at *6 (6th Cir. Sept. 27, 2012).  In executing the search warrant, the officers would have been permitted to search inside the purse and would have found the cash.  Pursuant to the inevitable discovery doctrine, Hammer would not be entitled to suppression of the cash seized from the purse.  See, e.g., United States v. Witherspoon, 467 F. App'x 486, 490-91 (6th Cir. 2012) (explaining that the inevitable discovery exception to the exclusionary rule applies when an "independent, untainted investigation . . . inevitably would have uncovered the [tainted] evidence," such as where a potentially illegal search is followed with a valid, warrant-supported search, which would have occurred in the absence of the illegal search) (internal quotations and citations omitted).

enforcement officers may only proceed with an interrogation if the detained person waives his Miranda rights. A valid Miranda waiver must be made both knowingly and voluntarily. United States v. Anderson, No. 10-3273, 2012 WL 4009702, at *2 (6th Cir. Sept. 13, 2012). The relevant question is whether the "suspect knew that he could choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." Id. In determining whether a Miranda waiver was made knowingly and voluntarily, the court "looks to the conduct, speech, and appearance of the accused during, and leading up to, the interrogation[.]" Id.

It is undisputed that Hammer was under arrest at the time of his initial "victim statement" interview, and that he was not informed of his Miranda rights until midway through that interview. At the time the interview began, Detective Fox was aware that Hammer was a convicted felon and that drugs were found in his house. Detective Fox also knew that his questions would possibly lead to incriminating responses from Hammer. While the primary purpose of the first interview may have been to take Hammer's "victim statement" as part of the investigation of the home invasion, the interview constituted a custodial interrogation. Therefore, the detectives were required to advise Hammer of his Miranda rights prior to any questioning.

Nevertheless, the court submits that the delay in Mirandizing Hammer should not result in suppression of any of his statements. Once Hammer began making the incriminating statement, Detective Fox immediately stopped the interview in order to advise Hammer of his Miranda rights. Hammer knowingly and voluntarily waived his rights and proceeded with the interview, including making statements about his possession of a firearm during the home invasion. In this case, the violation of Hammer's Miranda rights was promptly cured by Detective Fox. Moreover, Hammer's "suspect statements" were made after Detective Fox again advised Hammer of his rights and after he again waived his rights, and therefore those statements should not be suppressed. Finally, Hammer's post-arrest statements were not made as a result of any threats, promises, or coercive conduct by the police. See, e.g., United States v. Stevenson, No. 1:II-CR-350-ODE-RGV, 2012 WL 1418635, at *4 (N.D. Ga. Apr. 23, 2012) ("[T]here is no evidence that Defendant's emotional state, as evidenced by his crying, impaired his awareness of his rights at stake."); Brewster v. Carlton, No. 3:08-cv-250, 2009 WL 910967, at *9 (E.D. Tenn. Mar. 31, 2009) ("[A]lthough [the defendant] was upset, [she] did not appear to be under the influence of any alcohol or drugs and was intelligent and responsive."); Carr v. Warren, No. 05-CV-73763-DT, 2007 WL

2389816, at *10 (E.D. Mich. July 9, 2007) (affirming the Michigan Court of Appeals's finding that "although [the defendant] became emotional and cried at times, he was not extremely distraught such that he was not operating of his own free will" in making his statements).

### III. RECOMMENDATION

For the reasons above, it is recommended that Hammer's motion to suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

October 24, 2012
Date

### NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**